# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ROBERT L. YOAKEM,                                   Case No. 1:10-cv-639
     Plaintiff                                     Beckwith, J.
                                                    Litkovitz, M.J.

     vs

COMMISSIONER OF                                     **REPORT AND**
SOCIAL SECURITY,                                    **RECOMMENDATION**
     Defendant

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's applications

for disability insurance benefits (DIB) and supplemental security income (SSI).  This matter is

before the Court on plaintiff's Statement of Errors (Doc. 15) and the Commissioner's response

in opposition (Doc. 16).

## PROCEDURAL BACKGROUND

Plaintiff was born in 1953 and was 56 years old at the time of the decision of the

administrative law judge (ALJ).  Plaintiff has a high school education and past relevant work

experience as an electrician's helper, lab technician, assembler/machine operator,

assembler/production worker, small business owner, auto sales person and an auto mechanic.

Plaintiff filed applications for DIB and SSI on September 7, 2006, alleging disability

since March 30, 2002, due to a heart condition and bipolar disorder.  (Tr. 159-61,162-66; 199).[1]

Plaintiff's applications were denied initially and upon reconsideration.  (Tr. 102-28).  Plaintiff

---

[1]Plaintiff filed prior applications for benefits on April 25, 2000, alleging an onset date of disability of
February 18, 2000.  The previous applications were denied following an administrative hearing and decision dated
March 29, 2002.  (Tr. 89-101).  There is no indication from the record that plaintiff sought further review of that
decision.  Plaintiff's current applications for benefits originally included an onset date of disability of February 2000.
However, at the hearing, plaintiff amended his onset date to March 30, 2002, one day following the prior decision by
the ALJ.  (Tr. 36).

requested and was granted a de novo hearing before an ALJ. (Tr. 131). On August 19, 2009, plaintiff, who was represented by counsel, appeared and testified at a hearing before ALJ Barbara L. Beran. (Tr. 39-76). A vocational expert (VE), Steven S. Rosenthal, M.S., also appeared and testified at the hearing. (Tr. 76-87).

On November 23, 2009, the ALJ issued a decision denying plaintiff's DIB and SSI applications. The ALJ determined that the following impairments, viewed in combination, are considered severe: hypertension, hyperlipidemia, and coronary artery disease, status post a 1994 myocardial infarction, requiring angioplasty; chronic obstructive pulmonary disease, with continued tobacco use; sclerosis of the left femur; an intention tremor of the right non-dominant hand; an affective disorder; an anxiety disorder; and a history of alcohol and marijuana dependence, in reported full sustained remission since prior to March 2002. (Tr. 13). The ALJ further determined that plaintiff's alleged generalized arthritis is a non-severe medically determinable impairment. (Tr. 14). The ALJ found that plaintiff's impairments do not alone or in combination meet or equal the level of severity described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15). According to the ALJ, plaintiff has the physical residual functional capacity (RFC) to lift and carry 25 pounds frequently and 50 pounds occasionally, sit (with normal breaks) for six hours total in an eight hour work day, and stand and/or walk (with normal breaks) for six hours total in an eight hour work day. (Tr. 18-19). Plaintiff can frequently climb, stoop, kneel, crouch, and crawl. (*Id.*). The ALJ also limited plaintiff to the following nonexertional limitations: low stress work, which, in his case, is defined as simple repetitive non-public tasks that require no more than minimal or superficial contact with supervisors and coworkers. (*Id.*). The ALJ found that while plaintiff's medically

2

determinable impairments could reasonably cause some symptoms and limitations, the evidence

shows that plaintiff's testimony regarding the extent of such symptoms and limitations is not

fully credible. (Tr. 24). Using Medical-Vocational Rules 203.29, 203.22, and 203.15 as a

framework for decision-making, and relying on the testimony of the VE, the ALJ next

determined that plaintiff is not capable of performing his past relevant work. (Tr. 25-26). The

ALJ further determined that plaintiff is capable of performing a significant number of jobs in the

national economy including medium exertional unskilled jobs as a building cleaner, kitchen

helper, and sexton, as well as the unskilled light jobs of mail clerk, housekeeper, and cafeteria

attendant. (Tr. 25-26). Consequently, the ALJ concluded that plaintiff is not disabled under the

Act and is therefore not entitled to disability benefits. (Tr. 28).

Plaintiff's request for review by the Appeals Council was denied, making the decision of

the ALJ the final administrative decision of the Commissioner. (Tr. 1-5).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. §

405(g). The Court's sole function is to determine whether the record as a whole contains

substantial evidence to support the Commissioner's decision. The Commissioner's findings

stand if they are supported by "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing

*Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the

Commissioner's findings are supported by substantial evidence, the Court must consider the

record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

3

To qualify for DIB, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(1), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made

4

and the inquiry ends.  Third, if the individual has a severe impairment, the Commissioner must

compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.  If

the impairment meets or equals any within the Listing, disability is presumed and benefits are

awarded.  20 C.F.R. § 404.1520(d).  Fourth, if the individual's impairments do not meet or equal

those in the Listing, the Commissioner must determine whether the impairments prevent the

performance of the individual's regular previous employment.  If the individual is unable to

perform the relevant past work, then a prima facie case of disability is established and the burden

of going forward with the evidence shifts to the Commissioner to show that there is work in the

national economy which the individual can perform.  *Lashley v. Secretary of H.H.S.*, 708 F.2d

1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981).

      Plaintiff has the burden of proof at the first four steps of the sequential evaluation

process.  *Wilson* v. *Commissioner of Social Security,* 378 F.3d 541, 548 (6th Cir. 2004).  Once

plaintiff establishes a prima facie case by showing an inability to perform the relevant previous

employment, the burden shifts to the Commissioner to show that plaintiff can perform other

substantial gainful employment and that such employment exists in the national economy.

*Harmon* v. *Apfel,* 168 F.3d 289, 291 (6th Cir. 1999); *Born* v. *Secretary of Health and Human*

*Servs.,* 923 F.2d 1168, 1173 (6th Cir. 1990).  To rebut a prima facie case, the Commissioner

must come forward with particularized proof of plaintiff's individual capacity to perform

alternate work considering plaintiffs age, education, and background, as well as the job

requirements.  *Wilson,* 378 F.3d at 548.  *See also Richardson* v. *Secretary of Health & Human*

*Services,* 735 F.2d 962, 964 (6th Cir. 1984).  Alternatively, in certain instances the

Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut

plaintiff's prima facie case of disability.  20 C.F.R. Subpart P, Appendix 2; *Wilson,* 378 F.3d at 548.

A mental impairment may constitute a disability within the meaning of the Act.  *See* 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A).  However, the mere presence of a mental impairment does not establish entitlement to disability benefits.  In order for a claimant to recover benefits, the alleged mental impairment must be established by medical evidence consisting of clinical signs, symptoms and/or laboratory findings or psychological test findings.  20 C.F.R. Pt. 404, Subpt. P, App.1, § 12.00(B); *Moon v. Sullivan*, 923 F.2d 1175, 1182 (6th Cir. 1990).

Alleged mental impairments are evaluated under the same sequential analysis as physical impairments.  Once the Commissioner determines that a mental impairment exists, the Commissioner must then evaluate the degree of functional loss it causes according to a special procedure.  20 C.F.R.  §§ 404.1520a and 416.920a.  A standard review technique is completed at each level of administrative review for mental impairments.  *Id*.

This special procedure requires a rating of the degree of functional loss resulting from the impairment.  20 C.F.R. § 404.1520a(c)(3).  Plaintiff's level of functional limitation is rated in four areas: 1) activities of daily living; 2) social functioning; 3) concentration, persistence, or pace; and 4) episodes of decompensation.  *See Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1993) (per curiam).  The degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace) is rated using a five-point scale: None, mild, moderate, marked, and extreme.  The degree of limitation in the fourth functional area (episodes of decompensation) is rated using a four-point scale:  None, one or two, three, four or more.  The last point on each scale represents a degree of limitation that is

incompatible with the ability to do *any* gainful activity. 20 C.F.R. § 404.1520a(c)(4). Ratings above "none" and "mild" in the first three functional areas and "none" in the fourth functional area are considered severe. 20 C.F.R. § 404.1520a(d)(1).

Where the mental impairment is found to be severe, a determination must then be made as to whether it meets or equals a listed mental disorder. If it does not, the Commissioner must then assess plaintiff's mental residual functional capacity. The Commissioner must determine if this mental residual functional capacity is compatible with the performance of the individual's past relevant work, and if not, whether other jobs exist in significant numbers in the economy that are compatible with this assessment. *See* 20 C.F.R. §§ 404.1520(e)-(f), 404.1520a(c).

It is well-established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters* v. *Comm'r of Soc. Sec.,* 127 F.3d 525, 529-530 (6th Cir. 1997). *See also Harris* v. *Heckler,* 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."). Likewise, a treating physician's opinion is entitled to substantially greater weight than the contrary opinion of a nonexamining medical advisor. *Shelman* v. *Heckler,* 821 F.2d 316, 321 (6th Cir. 1987). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 416.927(d)(2); *see also Blakley* v. *Commissioner,* 581 F.3d 399, 406 (6th Cir. 2009); *Wilson* v. *Commissioner,* 378 F.3d 541, 544 (6th Cir. 2004).

"The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker* v. *Shalala,* 40 F.3d 789, 794 (6th Cir. 1994). The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2).

If the ALJ does not give the treating source's opinion controlling weight, then the ALJ must consider a number of factors when deciding what weight to give the treating source's opinion. 20 C.F.R. § 416.927(d). These factors include the length, nature and extent of the treatment relationship and the frequency of examination. 20 C.F.R. § 416.927(d)(2)(i)(ii); *Wilson,* 378 F.3d at 544. In addition, the ALJ must consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a

whole, and other factors which tend to support or contradict the opinion. 20 C.F.R. § 416.927(d)(3)-(6); *Wilson,* 378 F.3d at 544. The ALJ must likewise apply the factors set forth in § 416.927(d)(3)-(6) when considering the weight to give a medical opinion rendered by a non-treating source. 20 C.F.R. § 416.927(d). When considering the medical specialty of a source, the ALJ must generally give "more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 416.927(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 501 U.S. 89, 98 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043, 1990 WL 94, at *3 (6th Cir. Jan. 2, 1990). Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so

that remand would merely involve the presentation of cumulative evidence, or where the proof of

disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler,* 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

There is medical evidence in the record concerning both mental and physical limitations of plaintiff. However, because plaintiff focuses on alleged errors by the ALJ pertaining to his mental impairments, the Court has summarized the evidence only as to those impairments.

The record contains treatment notes from Richard Mizer, M.D., of Greenfield Family Practice Center from October 1997 through September 2006. (Tr. 270-347, 529-606, 612-13). From 2002 to 2005, the record reflects that plaintiff made no complaints of depression or anxiety to Dr. Mizer. Plaintiff first complained of depression to Dr. Mizer on April 12, 2006. (Tr. 284-85). Plaintiff reported that he does not want to do anything and noted decreased sleep, decreased eating pattern, and feeling miserable and depressed. (*Id.*). Dr. Mizer noted that plaintiff did look down and depressed and that he'd never seen him like that. (*Id.*). He ordered plaintiff to continue with Xanax and also prescribed Fluoxetine for plaintiff's depression. (*Id.*). In May 2006, Dr. Mizer suspected post traumatic stress syndrome and indicated that plaintiff needed professional mental health care. (Tr. 283). Dr. Mizer altered plaintiff's antidepressants when he complained of side effects or lack of improvement. (Tr. 277-82).

Plaintiff was examined by a psychiatrist, Diane Vickery, M.D., upon referral from Ms. Snellman, on August 14, 2006. (Tr. 375-79). He was referred due to depression and bad dreams. (Tr. 375). He reported he was "mentally paralyzed," had no ambition, and "wouldn't

10

care if the world blew up [tomorrow]." Dr. Vickery diagnosed plaintiff with bipolar disorder and generalized anxiety disorder, rule out dissociative disorder "or other cause for lack of memory - 1972 (wonders if was in Vietnam)," and prescribed Risperdal, Seroquel and Zyprexa. (Tr. 379). From August to November 2006, Dr. Vickery altered his medication when he complained of side effects. (Tr. 369-74).

On December 15, 2006, plaintiff reported to Dr. Vickery that his mind races 90 percent of the time. She diagnosed bipolar disorder and generalized anxiety disorder and adjusted plaintiff's medication. (Tr. 457).

Stephen Yerian, Psy.D., examined plaintiff on January 20, 2007, on behalf of the state agency. (Tr. 394-400). Plaintiff reported that he has been depressed on and off since he was 6 to 8 years old. (Tr. 395). He grew up in an alcoholic family and had several friends commit suicide. (*Id.*). He was married and divorced four times before age 27. Plaintiff also reported symptoms of becoming mentally paralyzed with no interest in anything, no motivation, and no pleasure at all. He reported three suicide attempts as well as irritability with anger, excessive sleep, feeling worthless and hopeless, feeling tired and fatigued most days, poor concentration, crying episodes, diminished appetite with weight loss, psychomotor slowing, and recurrent suicidal ideation. He further reported feeling "mentally wound up" with worry, anxiousness, and fear, as well as recurrent obsessive thoughts of aggression which were abhorrent to him and invoked intense anxiety. He further reported a history of excessive alcohol use, now in remission. He also used marijuana in the past. Dr. Yerian noted plaintiff presented with a generally dysphoric mood with flat affect, but was cooperative during the interview. (Tr. 397). Dr. Yerian diagnosed schizoaffective disorder, bipolar type; obsessive-compulsive disorder; and

11

psychological symptoms (anxiousness) affecting chronic obstructive pulmonary disorder and angina. (Tr. 399). He assigned plaintiff a Global Assessment of Functioning (GAF)[2] score of 41, though he noted that plaintiff's functional GAF score was 60.[3] (Tr. 399-400). Dr. Yerian opined that plaintiff was moderately limited in his ability to relate to others; not limited in his ability to understand and follow simple, concrete and not-detailed instructions; markedly limited in his ability to maintain attention, concentration, persistence and pace; and severely limited in his ability to withstand the stress of daily work. (Tr. 400).

On February 23, 2007, plaintiff reported to Dr. Vickery that he felt a little better but when he woke up he felt like he is "going to the gallows." (Tr. 456). On March 23, 2007, plaintiff was "pretty down" due to issues with his family. Dr. Vickery noted that plaintiff was "quite talkative, fairly focused, compulsive flavor to speech." (Tr. 455).

In March 2007, a state agency psychologist, Carl Tischler, Ph.D., reviewed the file and completed an RFC assessment. Dr. Tischler adopted the findings from the previous ALJ decision. (Tr. 411, 427). He concluded that plaintiff had mild limitations in his activities of daily living and moderate limitations in his social functioning and ability to maintain concentration, persistence or pace. (Tr. 423).

---

[2]A GAF score represents "the clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed., text rev. 2000). The GAF score is taken from the GAF scale, which "is to be rated with respect only to psychological, social, and occupational functioning." (*Id.*). The GAF scale ranges from 100 (superior functioning) to 1 (persistent danger of severely hurting self or others, persistent inability to maintain minimal personal hygiene, or serious suicidal act with clear expectation of death). (*Id.*) at 34.

[3]The DSM-IV categorizes individuals with scores of 41 to 50 as having "serious" symptoms. *See* DSM-IV at 32. Individuals with scores of 51-60 are classified as having "moderate" symptoms. (*Id.*). The next higher category, for scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." (*Id.*).

On April 27, 2007, plaintiff reported disturbed sleep and increasing depression with chronic suicidality, which he said he would never act on. (Tr. 454). Dr. Vickery altered plaintiff's medication and eliminated the diagnosis of generalized anxiety disorder in favor of a diagnosis of obsessive-compulsive disorder. (Tr. 454).

On May 19, 2007, Linda Snellman, LISW, reported that plaintiff suffered from low motivation, poor focus and concentration, fair insight and judgment, relationship problems, and memory problems. She also represented that she saw plaintiff twice a week for an hour at a time as of June 14, 2006.[4] She listed plaintiff's diagnoses as bipolar disorder, post traumatic stress disorder, and generalized anxiety disorder. She assigned plaintiff a GAF score of 65.[5] Ms. Snellman opined that plaintiff's impairments would cause him to be absent from work more than four days per month. (Tr. 448-50).

Ms. Snellman also completed a Mental Residual Functional Capacity Assessment. Ms. Snellman found plaintiff had mostly extreme limitations in various work-related mental functions, including: the ability to work in coordination with or in proximity to others without distracting them or exhibiting behavioral extremes; responding appropriately to co-workers or peers; working in cooperation with or in proximity to others without being distracted by them; maintaining attention and concentration for more than brief periods of time; performing at production levels expected by most employers; responding appropriately to changes in the work setting; and behaving predictably, reliably, and in an emotionally stable manner. Ms. Snellman further noted marked impairments in plaintiff's ability to perform and complete work tasks in a

---

[4] The record does not include any treatment records from Linda Snellman, LISW from June 2006 through May 2007.

[5] The DSM-IV categorizes individuals with scores of 61 to 70, refers to an individual with "some mild" symptoms who is "generally functioning pretty well." (*Id.*).

13

normal workday or work week at a consistent pace. Ms. Snellman concluded, "He has mood instability and quick to frustration/anger, he doesn't tolerate issues/stress from others, doesn't have consistent focus or follow through; minimal coping skills." (Tr. 451-53).

Plaintiff saw Dr. Vickery on May 22, 2007, wherein plaintiff reported that his mood was "not too bad," although he said his depression is actually constant. (Tr. 509).

In June 2007, state agency psychologist, Karen Stailey-Steiger, Ph.D., affirmed Dr. Tischler's assessment. (Tr. 476). Dr. Steiger reported that plaintiff's medications have been adjusted and he is seeing a counselor and psychologist. Dr. Steiger further indicated that plaintiff's condition had recently improved. (Tr. 476).

On August 21, 2007, Dr. Vickery noted that plaintiff was alert with good eye contact and relating well, but his speech was very detached. (Tr. 508). On December 14, 2007, plaintiff said his mood was "not too bad," yet he had suicidal thoughts daily and felt like a failure. He noted horrible intrusive thoughts. (Tr. 506).

On January 23, 2008 and February 20, 2008, plaintiff reported continuing suicidal thoughts and scary dreams involving death and blood. (Tr. 504-05). In April 2008, Dr. Vickery observed that plaintiff's mood was "not too bad," although he reported being sad at times. (Tr. 502). On July 22, 2008, plaintiff reported that one day a week his mood was fine and the other six days he felt useless, "like mentally stuck in quicksand." (Tr. 501). Dr. Vickery added a diagnosis of post-traumatic stress disorder and altered plaintiff's medication levels and regimen. (Tr. 500-05). In August 2008, plaintiff reported he was "not too bad" and noted improvement with treatment. (Tr. 500).

14

Plaintiff saw Ms. Snellman from April through December 2008. (Tr. 511-24, 527-28, 630). Ms. Snellman's notes indicate mostly normal objective findings. Notably, she assigned plaintiff GAF scores between 65 and 74.[6] In October 2008, Plaintiff reported being "50-75% better than when he started treatment." (Tr. 511-24, 527-28, 630).

Plaintiff saw Ms. Snellman in January and March 2009. Ms. Snellman made mostly normal objective findings and assigned him GAF scores of 74 and 76. (Tr. 625-28). Plaintiff decided to stop going to counseling in March because he had been "relatively stable over many months" and "all different areas of his life [were] going well." (Tr. 626).

## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff testified at the administrative hearing that he drove about every other day, taking short trips downtown or to his daughter's home. (Tr. 43). Plaintiff testified that his "worst problem" is being around people. (Tr. 49). He explained that he had been like this for ten or twenty years. (Tr. 49, 54). He explained that it irritates him for anyone to say anything to him or about him. (Tr. 51). Plaintiff noted he was fine around people until someone said something "bad" or "wrong," at which point he felt he could physically injure them. (Tr. 49). He said the problem started getting a little better when he began taking medication, but it was "picking up again." He testified that he stopped seeing his counselor, Linda Snellman, because she believed she had done all she could for him. (Tr. 52). She referred him to a psychiatrist, Dr. Vickery, and he still saw a counselor, Peggy Foster.[7] Plaintiff testified that he had trouble sleeping and had

---

[6]A GAF score of 71-80 indicates that any symptoms are transient, predictable reactions to psychological stressors and suggests no more than a slight impairment in functioning. DSM-IV-TR, at 33-34.

[7]The record does not contain any treatment notes from Ms. Foster.

15

bad dreams. Medication he was given to help him sleep tended to make him groggy in the morning and "it takes me about two or three hours to wake up." (Tr. 52).

As to his daily activities, plaintiff testified that he cooked only in the microwave. (Tr. 60-61). He did not wash dishes; he occasionally did laundry but did very little other housework; and he did not do any yard work. He generally slept for four hours during the day and stated that "sometimes that's how I get through the day." (Tr. 61). He watched television every day. (Tr. 65). He saw his girlfriend two or three times a week and his daughters every week or two. (Tr. 66). Plaintiff said he went fishing once in 2009. (Tr. 68). He had no hobbies other than listening to old rock and roll music off the computer. He said he thought about suicide every day, but had not made an attempt in the last roughly twenty years. (Tr. 73-74).

## OPINION

Plaintiff contends that the ALJ erred in rejecting the opinions of his treating counselor, Linda Snellman, his treating psychiatrist, Dr. Vickery, and the evaluating psychologist, Dr. Yerian. For the reasons that follow, the Court finds the decision of the ALJ is supported by substantial evidence and should be affirmed.

With respect to the "B" criteria for establishing a disabling mental impairment under the Listings, the ALJ found that plaintiff had mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence and pace. (Tr. 16-17). In so concluding, the ALJ rejected the findings of Ms. Snellman and Dr. Yerian who found that plaintiff was markedly limited in maintaining social functioning and maintaining concentration, persistence or pace.

16

Plaintiff argues primarily that the ALJ erred in rejecting the findings of Ms. Snellman and Dr. Yerian because they were based on plaintiff's subjective complaints. Plaintiff asserts that in assessing an individual's mental impairments, an examiner must, at least in part, rely upon statements of the patient as there are no exact diagnostic tests such as MRI's and x-rays. *See Blankenship v. Bowen*, 74 F.2d 1116, 1120-1124 (6th Cir. 1989) (finding mental impairments do not generally result in objective laboratory findings and that the opinions of a psychiatrist should not be rejected due to the impression of psychiatric methodology).

In this case, although the ALJ noted that Ms. Snellman and Dr. Yerian relied to some extent on plaintiff's subjective complaints, the ALJ rejected their assessments because she found they were not supported by or consistent with the evidence of record. (Tr. 20). Upon careful review, the undersigned finds that the ALJ's decision is substantially supported in this regard.

*A. Plaintiff's treating mental health sources*

Plaintiff argues that the ALJ erred in rejecting the opinion of her treating psychiatrist Dr. Vickery. However, the record does not contain any functional capacity assessments or treatment notes from Dr. Vickery relating to plaintiff's functional limitations. Notably, Dr. Vickery's treatment notes detail plaintiff's complaints of racing thoughts, suicidal ideation, and depression, but also include the following objective findings[8]: "does not show mania externally" (Tr. 369); "alert and pleasant" (Tr. 370); "relates well" (Tr. 454, 505, 510); "easy social speech" (Tr. 457); "stable" (Tr. 500); "logical, calm" (Tr. 502); and "logical, good eye contact." (Tr. 506).

---

[8] Objective medical evidence consists of medical signs and laboratory findings as defined in 20 C.F.R. § 404.1528(b) and (c). *See* 20 C.F.R. § 404.1512(b)(1). "Signs" are defined as "anatomical, physiological, or psychological abnormalities which can be observed, apart from your statements (symptoms). Signs must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development, or perception. They must also be shown by observable facts that can be medically described and evaluated." 20 C.F.R. § 404.1528(b).

Plaintiff has not directed the Court's attention to any specific treatment notes, clinical findings, or opinion evidence from Dr. Vickery indicating marked deficiencies in concentration or the ability to withstand the stress of daily work.

Moreover, the ALJ reasonably found that the objective evidence of record shows plaintiff's mental impairments improved over time with treatment. The ALJ noted that Dr. Vickery's treatment notes reveal that plaintiff's insomnia had improved, his symptoms had "improved with treatment," and plaintiff reported that his mood, behavior and activity level was "not too bad." (Tr. 22, citing Tr. 369, 500). Plaintiff fails to identify how the ALJ erred in evaluating Dr. Vickery's treatment notes and does not dispute that his condition improved. Accordingly, the undersigned finds that the ALJ did not err in evaluating Dr. Vickery's treatment notes.

Plaintiff argues next that the ALJ erred in rejecting the opinion of Ms. Snellman, plaintiff's treating therapist. In May 2007, Ms. Snellman completed a Mental Residual Functional Capacity Assessment wherein she found that plaintiff has extreme limitations in several areas of social interaction, concentration, persistence and adaptation. (Tr. 451-53). She opined that plaintiff would miss more than four days of work per month due to his mental impairment. (Tr. 450).

The ALJ correctly noted that as a social worker, Ms. Snellman's opinion is not entitled to controlling weight, nor is it treated as a medical opinion.[9] The ALJ then properly found that Ms.

---

[9]Only "acceptable medical sources" as defined under 20 C.F.R. § 404.1513(a) and § 416.913(a) can provide evidence which establishes the existence of a medically determinable impairment, give medical opinions, and be considered treating sources whose medical opinions may be entitled to controlling weight. *Id.* Licensed social workers are not "acceptable medical sources" and instead fall into the category of "other sources." SSR 06-03p (citing 20 C.F.R. § 404.1513(d)(1) and § 416.913(d)). Although information from "other sources" cannot establish the existence of a medically determinable impairment, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function." *Id.*

Snellman's opinion should be considered to the extent it sheds light on plaintiff's ability to work. *See* SSR 06-03p (information from "other sources" cannot establish the existence of a medically determinable impairment; however, the information "may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function"). The ALJ ultimately concluded that Ms. Snellman's opinion was not entitled to any great weight because it is not supported by or consistent with the evidence of record as a whole and is also inconsistent with Ms. Snellman's own treatment notes. (Tr. 20). The ALJ further noted that Ms. Snellman relied heavily on plaintiff's subjective reports.

The ALJ properly found that Ms. Snellman's May 2007 assessment was internally inconsistent. *See Render v. Sec'y of Health & Human Servs*., Case No. 88-5535, 1989 WL 34104, at *3 (6th Cir. April 3, 1989) (proper to discount treating physician's opinion which was internally inconsistent). Although Ms. Snellman found that plaintiff had extreme limitations due to his mental condition, she also assigned plaintiff a GAF score of 65 which indicates mild symptoms. (Tr. 451-52). In addition, while Ms. Snellman indicated that she began treating plaintiff in June 2006, primarily every two weeks for one hour, the record does not contain any treatment notes from Ms. Snellman prior to 2008. As such, Ms. Snellman's May 2007 assessment is largely unsupported by any contemporaneous clinical evidence. Ms. Snellman's findings were also inconsistent with those of the state agency psychologists who found that plaintiff had moderate difficulties maintaining concentration, persistence or pace. (Tr. 423, 476).

Furthermore, Ms. Snellman's notes from 2008 and 2009 indicate that plaintiff's condition was improving. Ms. Snellman noted that while plaintiff displayed an anxious or

19

depressed mood on occasion (Tr. 517, 519, 521), for the great majority of the time he experienced mild symptoms and frequently indicated that plaintiff's mood was "calm and friendly." (Tr. 511, 513, 515, 523, 525, 527, 625, 627, 629). Throughout this time period, plaintiff was assigned GAF scores ranging from 65-76 indicating very mild symptoms or a slight impairment in social or occupational functioning. (Tr. 512, 514, 516, 518, 520, 522, 524, 526, 528, 626, 628, 630). In addition, plaintiff reported in March 2009 that he had been relatively stable over "many months" and wanted to take a break from counseling. (Tr. 626). Upon review of the evidence of record as a whole, the ALJ reasonably found that the objective and other medical evidence established that plaintiff experienced improvement in his psychologically-based symptoms. (Tr. 22). Plaintiff does not offer any evidence to dispute this finding. Notably, although the record contains treatment notes from plaintiff's mental health sources through March 2009 (Tr. 624-631), plaintiff's statement of errors fails to address any record evidence subsequent to 2007 in support of her arguments. In light of the foregoing, the undersigned finds that the ALJ properly evaluated Ms. Snellman's opinions in accordance with agency regulations and controlling law and her decision is supported by substantial evidence in this regard.

### B. Dr. Yerian

Dr. Yerian, a consultative psychologist, examined plaintiff on January 20, 2007 on behalf of the state agency. (Tr. 394-400). Dr. Yerian diagnosed schizoaffective disorder, bipolar type; obsessive-compulsive disorder; and psychological symptoms (anxiousness) affecting chronic obstructive pulmonary disorder and angina. (Tr. 399). He assigned plaintiff a GAF score of 41, though he noted that plaintiff's functional GAF score was 60. (Tr. 399-400). Dr. Yerian opined

20

that plaintiff was moderately limited in his ability to relate to others; not limited in his ability to understand and follow simple, concrete and not-detailed instructions; markedly limited in his ability to maintain attention, concentration, persistence and pace; and severely limited in his ability to withstand the stress of daily work. (Tr. 400). The ALJ gave Dr. Yerian's RFC assessment "some weight insofar as [it is] consistent with the residual functional capacity findings reached in this decision." (Tr. 20). The ALJ rejected Dr. Yerian's findings that were inconsistent with his RFC finding. The ALJ determined that such findings were not supported by the evidence of record as a whole, in light of later acquired evidence Dr. Yerian did not have the opportunity to review. (Tr. 20). The ALJ also noted that Dr. Yerian relied on plaintiff's subjective reports of symptoms and limitations and that such statements by plaintiff cannot be afforded full credibility. (Tr. 20).

Although Dr. Yerian found that plaintiff was markedly limited in maintaining concentration, persistence or pace, the ALJ noted that during plaintiff's examination with Dr. Yerian plaintiff was able to understand the purpose of the interview and provide detailed information in response, and he displayed no deficits of logic, coherence, memory, orientation or alertness. (Tr. 17, 397-400). The ALJ further noted that treatment notes from April 2008 to March 2009 from plaintiff's mental health therapist reflect that plaintiff's concentration and attention were assessed at being within normal limits. (Tr. 17, 513-527, 625-629). Furthermore, Dr. Yerian's findings were inconsistent with the record as a whole which indicated that plaintiff's mental condition improved from late 2006 through 2009, a finding that plaintiff does not dispute. As detailed above, treatment notes from plaintiff's therapist from 2008 and 2009 reveal that plaintiff was assigned GAF scores ranging from 65 to 76, indicating very mild

21

symptoms or a slight impairment in social or occupational functioning. *See* DSM-IV at 34.[10]

Additionally, Dr. Yerian's findings were inconsistent with the state agency psychologists who

found that plaintiff had moderate difficulties maintaining concentration, persistence or pace. (Tr.

423). Accordingly, the undersigned finds the ALJ evaluated Dr. Yerian's opinion in accordance

with 20 C.F.R. § 404.1527(d)(4), and reasonably concluded that Dr. Yerian's assessment that

plaintiff was markedly limited in the ability to tolerate stress and maintain persistence and pace

were not supported by the evidence of record as a whole.

Lastly, plaintiff argues that the ALJ improperly rejected the findings of plaintiff's treating

and evaluating sources in favor of the opinions of the state agency reviewing psychologists.

(Doc. 15 at 13). Plaintiff contends the ALJ erred when she faulted Dr. Yerian and Ms. Snellman,

in part, because they did not have access to the record as a whole, yet credited the state agency

psychologists when they too were without all the record evidence. Plaintiff asserts that the state

agency psychologists did not review Ms. Snellman's May 2007 assessment or the subsequent

treatment notes from Ms. Snellman and Dr. Vickery.

On March 12, 2007, Dr. Tischler, a state agency psychologist, reviewed the medical

evidence at the request of the state agency and completed an RFC assessment. (Tr. 413-427).

Notably, on June 20, 2007, one month after Ms. Snellman's assessment, state agency

psychologist Karen Stailey-Steiger, Ph.D., reviewed the record evidence, noted recent medical

evidence showing improvement in plaintiff's functioning, and affirmed Dr. Tischler's RFC

---

[10]The undersigned recognizes that GAF scores do not directly measure plaintiff's functional limitations. However, such scores are helpful in analyzing plaintiff's mental impairments as they characterizes plaintiff's overall mental health. *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders,* 32 (4th ed., text rev. 2000) (A GAF score represents "the clinician's judgment of the individual's overall level of functioning.").

assessment. (Tr. 476). In any event, plaintiff's contention misinterprets the ALJ findings. The ALJ found that the assessments by the state agency psychologists were "consistent with and well-supported by the objective medical evidence, and they are accepted as an accurate representation of the claimant's status." (Tr. 19). As noted above, the evidence of record establishes that plaintiff's mental status improved over time, and thus the assessment by the state agency psychologist, although generated in March 2007 and affirmed in June 2007, accurately portrayed plaintiff's functioning through the date of the ALJ's decision. *See* 20 C.F.R. § 404.1527(d)(4) (the more consistent an opinion is with the record as a whole, the more weight the opinion will be given).

Where, as here, there is a conflict in the medical evidence as to plaintiff's functioning, it is the ALJ's function to resolve such conflicts. *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary of H.H.S.*, 823 F.2d 922, 928 (6th Cir. 1987); *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984). The ALJ's determination must stand if it is supported by substantial evidence regardless of whether the reviewing court would resolve the conflicts in the evidence differently. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). *See also Boyle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *Tyra v. Secretary of H.H.S.*, 896 F.2d 1024, 1028 (6th Cir. 1990). Here, the ALJ was faced with conflicting evidence relating to plaintiff's ability to maintain social functioning, concentration, persistence or pace, as well as plaintiff's ability to withstand work stress. As outlined above, the ALJ's resolution of this conflict was done in accordance with agency regulations and controlling law and is supported by substantial evidence.

23

Based on the foregoing, plaintiff's assignments of error are without merit and should be overruled .

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date:  8/22/2011

Karen L. Litkovitz
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

ROBERT L. YOAKEM,                        Case No. 1:10-cv-639
    Plaintiff                        Beckwith, J.
                                              Litkovitz, M.J.

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

**NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.  This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof. Failure to make objections in

accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Am,* 474 U.S. 140

(1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).

25